IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

JANICE CANTRELL, et al.,

    Plaintiffs,

      v.

WESLEY WHITE
individually and in his official capacity
as a police officer of the City of
College Park, Georgia, et al.,

    Defendants.

CIVIL ACTION FILE
NO. 1:11-CV-1239-TWT

# OPINION AND ORDER

This is a civil rights action. It is before the Court on the Defendant Wesley White's Motion for Summary Judgment [Doc. 102] and the Defendant the City of College Park's Motion for Summary Judgment [Doc. 103]. For the reasons set forth below, the Defendant Wesley White's Motion for Summary Judgment [Doc. 102] is DENIED and the Defendant the City of College Park's Motion for Summary Judgment [Doc. 103] is GRANTED.

# I. Background

On February 7, 2008, the City of College Park Police Department responded to a domestic violence complaint made by Phellan Robinson.[1] Robinson reported that Antoine Cantrell had assaulted her.[2] When the College Park Police arrived on the scene, Cantrell had already left, fleeing toward a housing authority property.[3] Later that day, the College Park Police Department received a second domestic violence complaint involving Cantrell.[4] The second complaint was made by Sara Varner.[5] Officer Tami Fowler responded to the complaint and spoke with Varner about the purported domestic violence.[6] But, like the first incident, Cantrell had already left the scene when Fowler arrived.[7]

---

[1] Statement of Material Facts in Supp. of Def. White's Mot. for Summ. J. ¶¶ 4-5.

[2] Id. ¶ 5.

[3] Id. ¶ 6.

[4] Id. ¶ 9.

[5] Id. ¶¶ 9-10.

[6] Id. ¶ 10.

[7] Id. ¶ 11.

The Defendant Officer Wesley White, along with Officers Long and Ware, responded to the complaint as backup for Fowler.[8] The officers began by searching the housing project area.[9] While White and Ware were searching the area, they spotted Cantrell, and he immediately fled.[10] White and Ware proceeded to chase after Cantrell on foot, but they got separated during the pursuit.[11] White then chased Cantrell into a ravine located near the housing authority property.[12] White lost sight of Cantrell while in the ravine.  But as he was leaving the ravine, he spotted Cantrell walking out of the ravine as well.[13]

According to the Defendants, White yelled to Cantrell, "Stop, College Park Police," and Cantrell began to walk toward him.[14] White then radioed to dispatch that he had located Cantrell.[15] White testified that he gave Cantrell multiple commands to stop walking and to get down on the ground, but "Cantrell would only feign going

---

[8]    Id. ¶ 12.

[9]    Id. ¶ 14.

[10]   Id. ¶ 16.

[11]   Id. ¶¶ 17-18.

[12]   Id. ¶ 18.

[13]   Id. ¶¶ 19-20.

[14]   Id. ¶¶ 20-21.

[15]   Id. ¶ 23.

down to the ground and would on several occasions put his hands up and then back down in a manner that would lead [him] to believe Cantrell did not fully comply with his commands."[16] By this point, White had drawn his gun.[17] When White got near Cantrell, he circled behind him and attempted to handcuff him.[18] White then placed his hand on Cantrell's collar and pushed him to go down on the ground, but as he pushed him, Cantrell spun around and reached for White's wrist in order to take away White's gun.[19] White and Cantrell then struggled for the gun, which ended with White's gun accidentally discharging into Cantrell's neck and both men falling to the ground.[20] Cantrell died as a result of the single gunshot wound.[21] White testified that he had only suffered minor bruising and scrapes.[22]

The Defendants further state that at some point during the altercation, Fowler and Northcutt arrived on the scene.[23] Both testified that they observed White and

---

[16]   Id. ¶¶ 24-25.

[17]   Id. ¶ 27.

[18]   Id. ¶ 26.

[19]   Id. ¶ 27.

[20]   Id. ¶ 29.

[21]   Id. ¶ 36.

[22]   Id. ¶ 33.

[23]   Id. ¶ 30.

Cantrell in a struggle, but neither witnessed the actual shooting.[24] Rather, they state that they heard the gunshot as they were exiting their patrol vehicles.[25] Fowler and Northcutt then saw White and Cantrell lying on the ground after the shot was fired.[26]

The Plaintiffs dispute the Defendants' version of the facts. The Plaintiffs contend that, based on their forensic expert's findings, there is a question of fact as to whether White intentionally shot Cantrell. They note that their expert, Dr. Emily Ward, found Cantrell's injury to be consistent with an "execution" style homicide.[27] The Plaintiffs also assert that there is an issue of fact whether Cantrell was actively resisting arrest when he was shot. Specifically, they cite Dr. Ward's testimony that the abrasions and contusions on Cantrell's shins were inconsistent with White's testimony that Cantrell refused to get on the ground and reached for the gun while on his feet.[28] Moreover, Dr. Ward testified that Cantrell's hands were likely behind his head when he was shot because there was soot on his shirt sleeve.[29] The Plaintiffs also note that

---

[24]   Id. ¶¶ 30, 32.

[25]   Id. ¶ 32.

[26]   Id.

[27]   Pls.' Br. in Opp'n to Def. White's Mot. for Summ. J., at 6.

[28]   Id. at 13.

[29]   Ward Dep. at 59-60.

White's uniform did not have any obvious tears or dirt on it, and that he did not suffer any serious injuries.[30] In sum, they contend that it is more likely that White intentionally shot Cantrell while Cantrell was on his knees with his hands behind his head.

Janice Cantrell, individually and on behalf of the Estate of Antoine Cantrell, and on behalf of the minor children of the Estate of Antoine Cantrell, filed suit against White and the City of College Park on April 4, 2011. Her Complaint seeks to recover damages for excessive use of force in violation of the Fourth Amendment, wrongful death, and negligence on the part of the City of College Park in training and supervising White.[31] Both the City of College Park and White move for summary judgment.[32]

---

[30]     Statement of Material Facts in Supp. of Pls.' Br. in Opp'n to Def. White's Mot. for Summ. J., at 6.

[31]     In what appears to be an error in the Plaintiffs' Complaint, the Plaintiffs also assert claims for "false imprisonment, misappropriation of the name of Alex White, criminal solicitation, intentional infliction of emotional distress and more." Comp. ¶ 4.

[32]     The Defendants object to the Plaintiffs' Sur-reply Briefs, which the Plaintiffs filed without seeking leave of the Court. [Docs. 116, 118]. Because the Plaintiffs' Sur-reply Briefs are in violation of Local Rule 56.1(A), the Court will not consider them in resolving the present Motions for Summary Judgment. See N.D. Ga. Local R. 56.1(A).

## II. Legal Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law.[33] The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant.[34] The party seeking summary judgment must first identify grounds to show the absence of a genuine issue of material fact.[35] The burden then shifts to the nonmovant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist.[36] "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be a sufficient showing that the jury could reasonably find for that party."[37]

---

[33]    FED. R. CIV. P. 56(a).

[34]    Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970).

[35]    Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).

[36]    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

[37]    Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).

### III. Discussion

**A.      White's Motion for Summary Judgment**

**1.      Section 1983 Claim**

In Count Three of their Complaint, the Plaintiffs assert a claim under 42 U.S.C. § 1983 against White,[38] alleging that his actions constituted unreasonable and excessive use of force in violation of the Fourth Amendment.[39] The Fourth Amendment right to be free from unreasonable seizures includes the right to be free from excessive force during an arrest.[40] When analyzing a claim of excessive force, courts employ the Fourth Amendment's "objective reasonableness" standard.[41] Thus,

---

[38]      The Plaintiffs bring their claim against White as an individual and in his official capacity. However, a claim against an officer in his official capacity is actually a suit against the officer's municipality, which, here, is the City of College Park. See Busby v. City of Orlando, 931 F.2d 764, 776 (11th Cir. 1991). Consequently, because the Plaintiffs also bring suit against the City of College Park, the Plaintiffs' § 1983 claim against White in his official capacity is dismissed.

[39]      To the extent the Plaintiffs raise any constitutional claims under the Fourteenth Amendment, the Court grants the Defendants' Motions for Summary Judgment as to those claims. The Supreme Court has explicitly held that "all claims that law enforcement officers have used excessive – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness standard,' rather than under a 'substantive due process' approach." Graham v. Connor, 490 U.S. 386, 395 (1989).

[40]      Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002).

[41]      Graham, 490 U.S. at 395-96; see also Crenshaw v. Lister, 556 F.3d 1283, 1290 (11th Cir. 2009).

"[i]n order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'"[42] The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.[43]

Police officers may seek the protection of qualified immunity if they were acting within their discretionary authority at the time of the arrest.[44] Once a police officer establishes that he was acting within the scope of his discretionary authority, the burden then shifts to the plaintiff to show (1) that the conduct violated a constitutional right, and (2) that the right was clearly established at the time of the defendant's alleged misconduct.[45] A right is clearly established "[i]f *no* reasonably competent officer would have taken the same action."[46]

---

[42]     Lee, 284 F.3d at 1197 (quoting Willingham v. Loughnam, 261 F.3d 1178, 1188 (11th Cir. 2001)).

[43]     Crenshaw, 556 F.3d at 1290 (quoting Graham, 490 U.S. at 396).

[44]     Lee, 284 F.3d at 1193-94.

[45]     See Pearson v. Callahan, 555 U.S. 223, 232 (2009).

[46]     Humphrey v. Mabry, 482 F.3d 840, 847 (6th Cir. 2007) (emphasis in original).

White first argues that the Plaintiffs have failed to allege a Fourth Amendment violation because he accidentally shot Cantrell, and, according to the Defendant, an unintentional shooting is not a seizure under the Fourth Amendment. Relying on forensic evidence, the Plaintiffs contend that there is at least a question of fact as to whether the Defendant intended to shoot Cantrell. The Eleventh Circuit has not directly ruled on whether an unintentional shooting falls within the ambit of the Fourth Amendment.[47] However, within the context of qualified immunity, the Eleventh Circuit recently noted that "[i]n this circuit, there is no clearly established right to be free from accidental application of force during arrest, even if that force is deadly."[48] Here, it is clear that White was acting within his discretionary authority when he pursued and attempted to arrest Cantrell.[49] Thus, if White's actions were unintentional, he would be entitled to qualified immunity.

---

[47]    Speight v. Griggs, 13 F. Supp. 3d 1298, 1312 (N.D. GA. 2013) ("The Eleventh Circuit has not decided whether or in what circumstances the purely accidental discharge of a firearm implicates the Fourth Amendment."), *vacated in part per curiam*, 620 Fed. Appx. 806 (11th Cir. 2015).

[48]    Speight v. Griggs, 620 Fed. Appx. 806, 809 (11th Cir. 2015) (per curiam).

[49]    See Crenshaw v. Lister, 556 F.3d 1283, 1289-90 (11th Cir. 2009) ("[I]t is clear that [the defendants] were both performing discretionary duties when pursuing and apprehending [the plaintiff].").

Viewing the evidence in a light most favorable to the Plaintiffs, the Court concludes there is an issue of fact as to whether White intentionally shot Cantrell. As the Plaintiffs correctly point out in their Response Brief, only White witnessed the shooting. Both Fowler and Northcutt stated that they did not witness the shooting because they were exiting their patrol vehicles when it occurred.[50] Moreover, the Plaintiffs' medical expert, Dr. Ward, testified that, in her opinion, it is very unlikely the gun accidentally discharged. To her, the shooting more closely resembled an "execution style shooting."[51] She further testified that the abrasion on Cantrell's skin was indicative of the gun being held firmly against his skin as the trigger was pulled. Moreover, she noted that the soot on Cantrell's shirt sleeve was consistent with his hand being in front of the gun, not on White's arm.[52] To be sure, both Fowler and Northcutt testified that White and Cantrell were involved in an altercation when they arrived. But "[g]iven the unique facts of the case, [the Court is] unable to say that no jury reasonably could find that [White's] shooting of [Cantrell] was intentional."[53]

---

[50]     Statement of Material Facts in Supp. of Def. White's Mot. for Summ. J. ¶ 32.

[51]     Ward Dep. at 54.

[52]     Id. at 48.

[53]     See Speight, 620 Fed. Appx. at 810.

Assuming, *arguendo*, that White intentionally shot Cantrell, the essential question becomes whether the Defendant's actions were nevertheless reasonable under the Fourth Amendment. When assessing an excessive force claim, the Court must pay "'careful attention to the facts and circumstances' of the case, 'including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'"[54] But courts should not mechanically apply these factors.[55] Rather, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation."[56]

Here, viewing the evidence in a light most favorable to the Plaintiffs and drawing all reasonable inferences in their favor, the Court concludes there is a question of fact concerning whether White's use of deadly force was reasonable under the Fourth Amendment. According to the Plaintiffs, Cantrell was not actively struggling when he was shot. They state that it is more probable his "knees were on

---

[54]    Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013) (quoting Graham v. Connor, 471 U.S. 386, 396 (1989)).

[55]    Id.

[56]    Graham, 471 U.S. at 396-97.

the ground" with "his hands likely were behind his head when he was shot."[57] They support this claim with Dr. Ward's testimony. As previously noted, Dr. Ward testified that it would be very difficult for White's gun to have misfired because it left an abrasion on Cantrell's skin.[58] Moreover, she stated that the soot on Cantrell's shirt sleeve made it very likely that his hand was in front of the gun, not on White's arm.[59] Finally, she stated that because Cantrell had abrasions and contusions on his shins, it is likely he was on his knees when he was shot.[60] The Plaintiffs also point out that when White was questioned whether he suffered any scrapes, scratches, or bruises during the incident, he merely replied "nothing serious."[61] Furthermore, the Plaintiffs note that White, when shown a picture of his uniform which was taken on the night of the shooting, testified his uniform did not have any obvious tears or dirt marks on it.[62] In sum,  based on the Plaintiffs' version of the facts, there is a question of fact as to whether Cantrell was struggling with White when he was shot.

---

[57]    Pls.' Br. in Opp'n to Def. White's Mot. for Summ. J., at 13.

[58]    Ward Dep. at 63.

[59]    Id. at 59-60.

[60]    Id. at 52.

[61]    White Dep. at 70-71.

[62]    Id. at 69-70.

The Defendant responds by pointing out that it is undisputed that Cantrell was suspected of being involved in two serious crimes: assaulting Phellan Robinson and a domestic disturbance with Sara Varner.[63] It is also undisputed that Cantrell fled from White and Ware when he was first spotted in the housing area.[64] Moreover, the Defendant stresses that both Fowler and Northcutt testified that White and Cantrell were in an altercation when they arrived at the scene, and that their testimony is in accordance with White's testimony that he and Cantrell were in an altercation when the shooting occurred. Nevertheless, the Plaintiffs' version of the facts paints a different picture. Based on the Plaintiffs' evidence, a reasonable inference could be drawn that Cantrell was on his knees with his hands behind his head and had stopped resisting at the time of the shooting. And, importantly, neither Fowler nor Northcutt witnessed the shooting. Thus, a reasonable jury could infer that Cantrell, who was unarmed, did not "pose[] a threat of serious physical harm" to White when he was shot.[65]

Felio v. Hyatt is instructive in resolving the instant issue. There, the Eleventh Circuit addressed whether a police officer used excessive deadly force when he shot

---

[63]   Statement of Material Facts in Supp. of Def. White's Mot. for Summ. J. ¶¶ 4, 9.

[64]   Id. ¶ 16.

[65]   Morton v. Kirkwood, 707 F.3d 1276, 1281 (11th Cir. 2013).

an unarmed man who was suspected of being involved in a domestic disturbance.[66] Concluding there was a question of fact regarding whether the situation had stabilized and the decedent had stopped resisting when he was shot, the Eleventh Circuit stated that, under the plaintiffs' version of the facts, the officers had disengaged from the struggle and both were standing up while the decedent was lying unarmed on the floor.[67] Additionally, the defendant had enough time to "wave to Officer Hydrick, wave to Mrs. Felio in response to her plea, and aim his gun."[68] Thus, the Eleventh Circuit held that because there was no longer an imminent threat of serious physical harm to the officers, the plaintiffs' facts demonstrated a Fourth Amendment violation.[69] Here, like the plaintiffs in <u>Felio</u>, the Plaintiffs' evidence creates an issue of fact as to whether Cantrell was actively resisting arrest when he was shot. A reasonable jury could infer from the Plaintiffs' evidence that the situation had stabilized before White shot Cantrell. The Court, therefore, is unwilling to conclude that White's actions were reasonable under the Fourth Amendment.

---

[66]    <u>Felio v. Hyatt</u>, No. 14-15702, 2016 WL 308695, at *2 (11th Cir. Jan. 26, 2016) (per curiam).

[67]    <u>Id.</u> at *3.

[68]    <u>Id.</u>

[69]    <u>Id.</u> at *4.

The Defendant then argues that he is entitled to qualified immunity. As noted above, White was clearly acting within his discretionary authority when he arrested Cantrell. Accordingly, the Plaintiffs have the burden of showing that Cantrell's clearly established rights were violated. "A plaintiff can demonstrate that a right was clearly established in a few ways. He can, for instance, produce a materially similar case decided by the Supreme Court, [the Eleventh Circuit], or the highest court of the relevant state."[70] But while "officials must have fair warning that their acts are unconstitutional, there need not be a case on all fours[] with materially identical facts, . . . so long as the prior decisions gave reasonable warning that the conduct at issue violated constitutional rights."[71] Furthermore, "[a] plaintiff can point to a 'broader, clearly established principle [that] should control the novel facts of [his] situation.'"[72]

The Eleventh Circuit and the Supreme Court have repeatedly held that the shooting of an unarmed suspect, who was not actively resisting an officer, is unreasonable under the Fourth Amendment.[73] "Moreover, shooting a compliant

---

[70]   Morton, 707 F.3d at 1282 (quoting Hoyt v. Cooks, 672 F.3d 972, 977 (11th Cir. 2012)).

[71]   Holloman v. Harland, 370 F.3d 1252, 1277 (11th Cir. 2004).

[72]   Morton, 707 F.3d at 1282 (quoting Mercado v. City of Orlando, 407 F.3d 1152, 1159 (11th Cir. 2005)).

[73]   See, e.g., Tennessee v. Garner, 471 U.S. 1, 11 (1985); Perez v. Suszczynski, 809 F.3d 1213, 1222 (2016).

individual is 'conduct [that] lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct [should have been] readily apparent.'"[74] Thus, because the Plaintiffs have raised an issue of fact concerning whether Cantrell was actively resisting White, the Defendant is not entitled to immunity at the summary judgment stage. But, of course, this does not mean that White may never receive qualified immunity. "[T]here are numerous disputed issues of material fact, which a fact-finder may ultimately resolve in his favor."[75]

### 2.   State Law Claims

White moves for summary judgment on the Plaintiffs' state law claims, arguing that the Plaintiffs have failed to set forth a prima facie case for each claim. In their Complaint, the Plaintiffs state they are asserting claims for "false imprisonment, misappropriation of the name Alex White, criminal solicitation, intentional infliction of emotional distress, and more."[76] But they fail to allege any evidence to support these claims. Thus, to the extent the Plaintiffs intended to assert these state law claims, the Defendants are entitled to summary judgment for each claim.  With regard to their wrongful death claim, however, the Plaintiffs do allege a prima facie case.

---

[74]   Felio, 2016 WL 308695, at *4.

[75]   Perez, 809 F.3d at 1223.

[76]   Compl. ¶ 4.

Specifically, they allege that the "[d]ecedent's injuries were the direct and proximate result of the willful and wanton acts of the Defendant City and the Defendants, the Police Department and Officer White."[77] The Plaintiffs support this claim by alleging facts that demonstrate Cantrell's death was the result of an intentional shooting.[78]

In response, White does not appear to specifically challenge whether the Plaintiffs have set forth a prima facie case for their wrongful death claim. Rather, White contends that he is entitled to official immunity. In Georgia, "[p]ublic agents are immune from liability for their discretionary acts unless they are done with malice or intent to injure."[79] The Plaintiffs, therefore, must prove that the public agent acted with "actual malice" in order to overcome official immunity.[80] To determine whether a public agent acted with actual malice, a court must "inquire into [the agent's] subjective intent."[81] Moreover, "[a]ctual malice is a demanding standard: it requires an officer to act with 'a deliberate intention to do a wrongful act.'"[82] "In the context

---

[77]   Id. ¶ 20.

[78]   Id. ¶ 16.

[79]   Taylor v. Waldo, 309 Ga. App. 108, 111 (2011).

[80]   Valades v. Uslu, 301 Ga. App. 885, 889-91 (Ga. Ct. App. 2009).

[81]   Jordan v. Mosley, 487 F.3d 1350, 1357 (11th Cir. 2007).

[82]   Black v. Wigington, 811 F.3d 1259, 1266 (11th Cir. 2016) (quoting Adams v. Hazelwood, 271 Ga. 414, 414 (1999)).

of a shooting by a police officer, the Supreme Court of Georgia has held that if the officer shot 'intentionally and without justification, then [he] acted solely with the tortious actual intent to cause injury' and would not be protected by official immunity."[83] "If, however, the officer shot 'in self-defense, then [he] had no actual tortious intent to harm . . . .'"[84] Self-defense is defined as "use [of] such force as is reasonably believed to be necessary to prevent death or great bodily injury to themselves or the commission of a forcible felony."[85]

Here, as previously discussed, the Plaintiffs have raised a question of fact with regard to whether White intended to shoot Cantrell. Moreover, the Plaintiffs have raised a question of fact regarding whether Cantrell was actively resisting arrest when he was shot. If, in fact, Cantrell was not actively resisting and White intentionally shot him, then White's actions are without justification.[86] Thus, viewing the evidence in a light most favorable to the Plaintiffs, the Court concludes that White is not entitled to official immunity at this time.

**B.     The City of College Park's Motion for Summary Judgment**

---

[83]     Porter v. Massarelli, 303 Ga. App. 91, 96 (2010) (quoting Kidd v. Coates, 271 Ga. 33, 34 (1999)).

[84]     Id. (citing Kidd, 271 Ga. at 34).

[85]     Id.

[86]     See DeKalb Cnty. v. Bailey, 319 Ga. App. 278, 282-83 (2012).

### 1.    Section 1983 Claim

The Plaintiffs allege that the City of College Park is subject to § 1983 liability for White's actions. Because a municipality is not liable through *respondeat superior* for the wrongful acts of its employees, to establish § 1983 liability against the City of College Park, the Plaintiffs must show that the constitutional deprivation resulted from a custom or policy of the City.[87] A policy or custom may be proven through a "failure to train or supervise" theory.[88] A city is only liable based upon this theory "where [1] the municipality inadequately trains or supervises its employees, [2] this failure to train or supervise is a city policy, and [3] that city policy causes the employees to violate a citizen's constitutional rights."[89] "Since a municipality rarely will have an express written or oral policy of inadequately training or supervising its employees, the Supreme Court has further explained that a plaintiff may prove a city policy by showing that the municipality's failure to train evidenced a 'deliberate indifference' to the rights of its inhabitants . . . ."[90] "To establish a 'deliberate or conscious choice'

---

[87]    Gold v. City of Miami, 151 F.3d 1346, 1350 (11th Cir. 1998) (citing Monell v. Department of Social Servs., 436 U.S. 658, 691, 694-95 (1978)).

[88]    City of Canton v. Harris, 489 U.S. 378, 388 (1989).

[89]    Gold, 151 F.3d at 1350 (citing City of Canton, 489 U.S. at 389-91).

[90]    Id.; see also Church v. City of Huntsville, 30 F.3d 1332, 1345 (1994) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly

or such 'deliberate indifference,' a plaintiff must present some evidence that the municipality knew of a need to train and/or supervise in a particular area and the municipality made a deliberate choice not to take any action."[91]

Here, the Plaintiffs' allegations are insufficient to prove that the City of College Park was deliberately indifferent toward police misconduct. The Plaintiffs first allege that the City was on notice that White had a pattern of using excessive force. In support of this contention, they cite to three complaints of misconduct filed against White.[92] But two out of three complaints were filed after the incident at issue.[93] For the one complaint that was filed prior to the shooting, an investigation into the complaint explicitly concluded that White was merely present at the scene and did not take part in the arrest.[94] Thus, with regard to prior misconduct by White, the Plaintiffs have failed to demonstrate deliberate indifference by the City of College Park.[95] The

---

authorizes these actions or displays deliberate indifference towards the police misconduct." (quoting Brooks v. Scheib, 813 F.2d 1191, 1193 (11th Cir. 1987))).

[91]    Gold, 151 F.3d at 1350.

[92]    Pls.' Br. in Opp'n to Defs.' Mots. for Summ. J., Exs. C-E.

[93]    Id. Exs. C-D.

[94]    Id. Ex. E.

[95]    See Brooks, 813 F.2d at 1193 ("Quite simply, there is no evidence that city officials were aware of past police misconduct.").

Plaintiffs also note that White was involved in a romantic affair with another officer and failed to report this conduct to the College Park Police Department.[96] However, the Plaintiffs have failed to demonstrate how a romantic affair that violated College Park Police Department internal policies is germane to the instant case.

Next, the Plaintiffs allege five policies of the College Park Police Department and argue that these policies demonstrate "systemic deficiencies in its police department arising from the deliberate indifference of the City and its policymakers."[97] The five policies listed are:

> 1) Failure to train officers that citizens have the right to inquire of the officer(s) as to the purpose of their presence;
> 2) Failure to train officers that citizens have the right to keep the police out of their homes without a warrant unless there are exigent circumstances.
> 3) Failure to train officers in the proper tactics and methods of arrest and proper use of force therein;
> 4) Maintaining a constitutionally overbroad policy which permits officers to make forcibly detain [sic] a person under circumstances which are not Constitutionally permissible;
> 5) By engaging in a custom or practice of failing to conduct thorough, objective, and uniform investigations and evaluations of officer misconduct and incidents involving the use of force, with the result being that officers were led to believe that they could violate the Fourth Amendment with impunity.[98]

---

[96]     Pls.' Br. in Opp'n to Def. City of College Park's Mot. for Summ. J., at 8.

[97]     Compl. ¶¶ 33-34.

[98]     <u>Id.</u> ¶ 34.

The first and second policies are irrelevant to the instant case. For the third policy, the City of College Park has presented evidence that contradicts the Plaintiffs' assertion. Specifically, the City has presented evidence that White received all state mandated use of force and firearms training, and that he completed an additional four hours of firearms and use of force training just two months before the incident in question.[99] Moreover, the Plaintiffs offer no evidence that the City of College Park had notice of other constitutional violations resulting from a failure to train.[100] For polices four and five, the record –  once again – does not support the Plaintiffs' contention. They have not presented any evidence of other officers using excessive force and, therefore, have failed to prove that the City of College Park was aware that its policy resulted in constitutional violations.[101] Nor have they presented any evidence that the City of College Park failed to properly investigate citizens' complaints. "[The Plaintiffs] were obligated to produce some evidence that the complaints against

---

[99]     Statement of Material Facts in Supp. of Def. City of College Park's Mot. for Summ. J. ¶ 13.

[100]     Wright v. Sheppard, 919 F.2d 665, 674 (11th Cir. 1990) (finding no deliberate indifference where the plaintiff offered "no evidence of a history of widespread prior abuse . . . that would have put the [defendant] on notice of the need for improved training or supervision.").

[101]     See Board of Cnty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 410 (1997) ("'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action.").

[White] had some merit and that more effective citizens' complaint procedures would have prevented his injuries. [The Plaintiffs] made no such showing."[102] Accordingly, the Court grants the City of College Park's Motion for Summary Judgment with respect to the Plaintiffs' constitutional claims.

### 2.      State Law Claims

The Plaintiffs assert state law tort claims of negligent hiring and wrongful death against the City of College Park. The City of College Park contends that both of the Plaintiffs' claims lack merit. However, neither party addresses in their respective briefs the issue of sovereign immunity.[103] In Georgia, tort claims against municipalities are generally barred by the doctrine of sovereign immunity unless the municipality has waived its sovereign immunity.[104] A plaintiff bears the burden of establishing waiver of sovereign immunity.[105] Here, the Plaintiffs have failed to allege that the City of College Park waived its sovereign immunity. Accordingly, the City

---

[102]    Brooks v. Scheib, 813 F.2d 1191, 1195 (11th Cir. 1987).

[103]    It should be noted that the City of College Park did raise sovereign immunity as a defense in its Answer. [Doc. 4].

[104]    O.C.G.A. § 36-33-1; see also Peeples v. City of Atlanta, 189 Ga. App. 888, 890 (1989).

[105]    Scott v. Valdosta, 280 Ga. App. 481, 484 (2006).

of College Park is entitled to summary judgment with respect to the Plaintiffs' state law claims.

## IV. Conclusion

For these reasons, the Court DENIES the Defendant Wesley White's Motion for Summary Judgment [Doc. 102] and GRANTS the Defendant the City of College Park's Motion for Summary Judgment [Doc. 103].

SO ORDERED, this 4 day of April, 2016.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge